IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RAYMOND GASTON          :
POWELL, III,            :
    **Plaintiff**        :
                                        :     **No. 1:20-cv-348**
          **v.**          :
                                          :     **(Judge Rambo)**
MAIL INSPECTOR CHARLES  :
MCKEOWN, *et al.*,      :
    **Defendants**      :

**MEMORANDUM**

This matter is before the Court pursuant to Defendants Lieutenant Gardzalla ("Gardzalla") and Charles McKeown ("McKeown")'s motion for summary judgment. (Doc. No. 41.) The motion is fully briefed and ripe for disposition.

**I.     BACKGROUND**

Plaintiff, who is currently incarcerated at the State Correctional Institution in Coal Township, Pennsylvania ("SCI Coal Township"), initiated the above-captioned action on January 13, 2020 by filing a complaint pursuant to 42 U.S.C. § 1983 against Defendants McKeown, Gardzalla, Superintendent Mahally ("Mahally"), and Zachary Moslak ("Moslak") in the United States District Court for the Eastern District of Pennsylvania. (Doc. No. 2.) In an Order dated February 24, 2020, that court transferred the matter to this Court for further proceedings. (Doc. No. 5.)

Plaintiff's complaint concerns events that occurred while he was incarcerated at SCI Dallas. (Doc. No. 2 at 4.) Plaintiff alleges that on January 9, 2019, he

received a notice of confinement report and was taken to the Restricted Housing Unit ("RHU"). (*Id.* at 15, 35.) On January 10, 2019, Plaintiff received a misconduct in which Defendant Gardzalla charged him with assaulting another inmate. (*Id.* at 15, 36.) Plaintiff completed an inmate version of events, arguing that he had not assaulted another inmate and that he was "singled out by a rumor, or hearsay." (*Id.* at 15, 37.)

Plaintiff appeared before Defendant McKeown for a disciplinary hearing on January 14, 2019. (*Id.* at 15, 38.) During the hearing, Plaintiff presented "his version that he did not do this, and that he was confined to his living quarters where movement between dorms at night is prohibited." (*Id.* at 15.) Plaintiff also argued that he "lives downstairs and the assault victim lives [u]pstairs where movement from upstairs to downstairs is especially prohibited." (*Id.*) Plaintiff presented testimony from inmate Victor Brown. (*Id.*) Plaintiff alleges that after inmate Brown testified, Defendant McKeown called Defendant Gardzalla and informed him of inmate Brown's testimony. (*Id.*) Defendant Gardzalla went to inmate Brown's housing unit, handcuffed him, and took him to security. (*Id.*) Plaintiff maintains that Defendant Gardzalla threatened inmate Brown with being Plaintiff's accomplice. (*Id.* at 15-16.)

Plaintiff's disciplinary hearing was continued to January 17, 2019. (*Id.* at 16.)

According to Plaintiff, Defendant Gardzalla appeared and "presented the unsworn

testimony he had taken under [d]uress from inmate Brown and used it to impeach

Plaintiff['s] witness at the hearing." (*Id.*)   Defendant McKeown found Plaintiff

guilty of the charge. (*Id.* at 16, 42.)  Plaintiff maintains that he was found guilty

"where the only evidence against him in support of the [c]harge was [a] third[-]party

hearsay statement by [Defendant] Gardzalla." (*Id.* at 16.)   He appealed to the

Program Review Committee ("PRC"), which denied his appeal. (*Id.* at 46.)  Plaintiff

then appealed to Defendant Mahally, who denied his second level appeal.  (*Id.* at

30.)  Plaintiff then submitted a final appeal to Defendant Moslak, the Chief Hearing

Examiner for the Department of Corrections ("DOC").  (Doc. No. 2-1.)  On March

12, 2019, Defendant Moslak dismissed Plaintiff's appeal, noting that his twenty

(20)-page appeal failed to meet criteria that appeals include a brief statement of the

relevant facts.  (Doc. No. 2 at 28.)  Plaintiff asked for reconsideration, noting that

his appeal totaled twenty (20) pages because it included the requisite documentation

from the misconduct proceedings and lower appeals.  (*Id.* at 27.)  Plaintiff alleges

that afterwards, Defendant Gardzalla ordered his television, typewriter, and

commissary destroyed. (*Id.* at 17.)  Plaintiff maintains that his commissary totaled

$104.00 but that he was only reimbursed $86.00 after his family called to complain.

(*Id.*)  Plaintiff further alleges that when he "began to suffer severe anxiety [a]nd [d]epression while in the [RHU], they transferred [him] so that he [c]ould not continue his process for relief."  (*Id.*)  He asserts that he "has been moved further from his home where he had once received visits on [a] monthy basis, and now can see his family only a few times a year."  (*Id.* at 18.)  Plaintiff also maintains that he is now at a "[m]ore strict and confined institution."  (*Id.*)

Based on the foregoing, Plaintiff alleges that his First Amendment rights were violated when Defendant Gardzalla retaliated against him for using the grievance process by destroying his television, typewriter and commissary.  (*Id.* at 14.)  Plaintiff suggests further that his due process rights under the Fourteenth Amendment were violated during misconduct proceedings. (*Id.* at 12-13.)  Finally, Plaintiff suggests that his Eighth Amendment right to be free from cruel and unusual punishment was violated.  (*Id.* at 19.)  Plaintiff seeks injunctive relief as well as damages.  (*Id.*)

In an Order dated February 28, 2020, the Court granted Plaintiff leave to proceed *in forma pauperis* and directed service of his complaint upon Defendants. (Doc. No. 9.)  Defendants filed a motion to dismiss on April 28, 2020 (Doc. No. 13) and their brief in support thereof on May 11, 2020 (Doc. No. 14).  On May 12, 2020, observing that Defendants raised the issue of whether Plaintiff properly exhausted

his administrative remedies with respect to his claims in accordance with the Prison Litigation Reform Act ("PLRA"), the Court issued a *Paladino* Order informing the parties that it would consider the exhaustion issue in the context of summary judgment and, by doing so, would consider matters outside the pleadings in its role as factfinder.[1]   (Doc. No. 15.)   The Court directed Defendants to amend or supplement their motion to dismiss to address the issue of administrative exhaustion and to include a statement of material facts in accord with Local Rule 56.1 within twenty-one (21) days.  (*Id.*)   The Court further directed that Plaintiff respond to Defendants' supplemental materials within twenty-one (21) days of their filing date. (*Id.*)  Plaintiff filed a brief in opposition on May 29, 2020.  (Doc. No. 16.)  On June 2, 2020, Defendants filed their brief regarding exhaustion and their statement of facts.  (Doc. Nos. 18, 19.) On June 2, 2020, Plaintiff filed a motion for a continuance pursuant to Rule 56(f) of the Federal Rules of Civil Procedure (Doc. No. 20) and his brief in opposition to Defendants' supplemental brief (Doc. No. 21).  On July 6, 2020, Plaintiff filed his responsive statement of facts.  (Doc. No. 22.)

In a Memorandum and Order dated August 6, 2020, the Court denied Plaintiff's motion for a continuance and granted in part and denied in part the motion to dismiss, construed as a motion for summary judgment on the issue of

---

[1] *See Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018).

administrative exhaustion.  (Doc. Nos. 23, 24.)  Specifically, the Court granted the motion as to Plaintiff's Eighth Amendment claim, his First Amendment retaliation claims, and his Fourteenth Amendment claims against Defendants Mahally and Moslak.  (*Id.*)  The Court denied the motion with respect to Plaintiff's Fourteenth Amendment due process claims against Defendants McKeown and Gardzalla.  (*Id.*) The parties subsequently engaged in discovery, at the close of which Defendants filed their motion for summary judgment.  (Doc. No. 41.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element

of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White*, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.* (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. *See Sanders v. Beard*, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); *Thomas v. Norris*, No. 02-CV-01854, 2006 WL

2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules

of Civil Procedure).

## III.   STATEMENT OF MATERIAL FACTS[2]

Plaintiff is an inmate currently incarcerated at SCI Coal Township.  (Doc. No.

42 ¶ 1.)  At all relevant times, Defendant Gardzalla was employed as a Lieutenant,

and Defendant McKeown was employed as a Hearing Examiner.  (*Id.* ¶ 3.)  Plaintiff

is serving a sentence for aggravated assault. imposed by the Court of Common Pleas

for Montgomery County.  (*Id.* ¶ 5.)

Petitioner was incarcerated at SCI Dallas between December 19, 2017 and

April 9, 2019.  (*Id.* ¶ 6.)  On January 5, 2019, he was "housed in the O building, C

dorm, where he was assigned to bed no 22."  (*Id.*)  On that date, at 10:20 p.m., Officer

Bienkowski was conduct rounds when he observed inmate O'Connor sitting on a

bunk in the O building, D dorm, "holding a towel over his left eye, and appearing to

be bleeding."  (*Id.* ¶ 7.)  Officer Bienkowski asked inmate O'Connor what happened,

---

[2] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1.  The Rule further requires the inclusion of references to the parts of the record that support the statements.  *Id.* Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. *See id.*  Here, Plaintiff has filed a response to Defendants' statement of material facts in compliance with M.D. Pa. L.R. 56.1.  Accordingly, the Court sets forth the undisputed facts above with footnotes setting forth the parties' relevant factual disputes.

and inmate O'Connor responded that he fell.  (*Id.* ¶ 8.)  Officer Bienkowski directed

inmate O'Connor to report the CO desk and contacted control.  (*Id.*)  Nurse Waligun

subsequently escorted inmate O'Connor to the infirmary, where she evaluated his

injuries, including: (1) a left eye lower orbit laceration; (2) a stab wound to the

midback; (3) a stab wound to the right upper arm; and (4) a superficial slash on the

right side the abdomen.  (*Id.* at 3.)[3]  Nurse Walignun treated inmate O'Connor and

admitted him "to the infirmary with the objective diagnosis of being assaulted."  (*Id.*

¶ 9.)  Although inmate O'Connor continued to report that he fell, medical staff took

notes of the treatment provided and "consistently noted his injuries were consistent

with being assaulted and stabbed with lacerations to his eye, back, arm[,] and

abdomen."  (*Id.* ¶ 10.)

    Corrections officials, including Defendant Gardzalla, investigated the

incident as an assault, which led to Plaintiff being identified as the suspected

assailant and being placed into administrative custody on January 9, 2019.  (*Id.*

¶ 11.)  Plaintiff "was called from his dorm at 11:45am to the officer's desk where he

was given a pass and instructed to report to intake, where he was handcuffed by the

intake guard, and taken to the security office where he was questioned by two male

---

[3] Defendants' statement of facts contains "two misnumbered paragraphs due to a clerical error and
inadvertent oversight by undersigned counsel."  (Doc. No. 44 at 5 n.1.)  The Court, therefore, uses
the page number rather than the pinpoint citation for this cite.

lieutenants."   (*Id.* ¶ 12 (internal citations omitted).)   Plaintiff was subsequently

placed in administrative custody in the Restricted Housing Unit ("RHU") "pending

an investigation of an alleged violation of facility rules."  (*Id.* ¶ 13.)

Plaintiff claimed that on the night of January 5, 2019, "he did not see the

assault victim, but overheard other inmates in the bathroom talking about the fact

that somebody was fighting or somebody had fallen out of a bunk."  (*Id.* ¶ 14.)

Plaintiff claimed that other inmates were saying that "the victim 'was bleeding and

stuff' like that on the night of the assault but that [he] did not know any specific[s]

about the victim's injuries." (*Id.*)  Moreover, "when the victim came downstairs, 'he

had a towel around his head.'"  (*Id.*)  On January 10, 2019, medical staff saw Plaintiff

for a mental health wellness check, during which he stated: "All I got was a notice

of confinement.  I don't know why I'm down here.  I been out of trouble for the past

five years so I don't get it."  (*Id.* ¶ 15.)

On January 10, 2019, Defendant Gardzalla issued Misconduct Report

#B352407 to Plaintiff, charging him with a Class 1 misconduct for assault.  (*Id.*

¶ 16.)  The report stated: "On 01/05/2019 Powell SX2600 did assault another inmate

on O Block.  The injuries required medical attention.  Inmate Powell was positively

identified by CSI #18DAL 108."  (*Id.*)  The Misconduct Report did not identify the

assault victim, where he resided, the nature of his injuries, the location of the assault,

and the identity of the confidential informant ("CI") who identified Plaintiff as the assailant. (*Id.* ¶ 17.) An officer provided Plaintiff a copy of the Misconduct Report at approximately 1:00 p.m. on January 10, 2019, "along with forms allowing him to request representation and witnesses and provide a statement setting forth his version of events." (*Id.* ¶ 18.) Plaintiff submitted his written version and a "request to have, *inter alia*, inmate Victor Brown . . . testify as a witness at the disciplinary hearing." (*Id.* ¶ 19.) Plaintiff claimed that he and inmate Brown had not had any conversations about the assault and that he had only learned of inmate Brown's "knowledge of the events and involvement with the aftermath of the assault while [Plaintiff] was in the RHU." (*Id.* ¶ 20.) Plaintiff claimed that he did not know whether inmate Brown, who also resided in O building, C dorm, had knowledge of inmate O'Connor's "whereabouts following the assault and prior to January 9, 2019." (*Id.* ¶ 21.) Plaintiff requested inmate Brown as a witness because he "was there" and was around Plaintiff when he was in "the dorm area." (*Id.* ¶ 22.)

Defendant McKeown presided over Plaintiff's disciplinary hearing on January 14, 2019. (*Id.* ¶ 23.) He received "*in camera* testimony pursuant to the provisions of DC-ADM 801 § 3.D.7 relating to a confidential source of information." (*Id.*) The hearing report indicated that Defendant McKeown "received testimony *in camera* and under oath about the reliability of the [CI] which

he described therein as 'how the CSI was in the position to have first hand knowledge

of the incident as well as how the CSI statement was [c]orroborated.'" (*Id.*)  The CI

stated that he "observed I/m Powell 'laying in wait.'  When I/M O'Connor arrived,

I/M Powell attacked [him] by striking O'Connor in the head with a closed first and

then striking I/M O'Connor several more times with an edged weapon." (*Id.*)[4]

At 10:30 a.m., Defendant McKeown reviewed a "confidential medical

incident report which detailed the injuries suffered by the victim as being 'a left eye

lower orbit laceration, a stab wound to the mid back, a stab wound to the right upper

arm, and a superficial slash on the right side of the abdomen." (*Id.* ¶ 24.)  At 11:10

a.m., after Defendant McKeown reviewed the *in camera* testimony and the

confidential medical report, Plaintiff was "escorted from his confinement within the

RHU to the disciplinary hearing room, where he was advised of the *in camera*

testimony received . . . and given an opportunity to provide his version of events,

which he did provide in both a written statement and through oral testimony." (*Id.*

¶ 25.)

Inmate Brown then provided testimony. (*Id.* ¶ 26.)  He testified that he was

cleaning the bathroom when inmate O'Connor came down bleeding and that he

---

[4] The *in camera* testimony and information have been filed with the Court, "under seal, for
exclusive viewing by the Court *in camera* in accordance with the procedures outlined in
*Henderson v. Carlson*, 812 F.2d 874, 879 (3d Cir. 1987." (Doc. No. 42 ¶ 23.)

helped inmate O'Connor clean up blood. (*Id.*)  Inmate Brown testified that Plaintiff "was forced to stay in the dorm all day on the day of the assault because he was sick" and that Plaintiff "was in his bunk at the time of the assault."[5]  (*Id.*)  Plaintiff was permitted to question inmate Brown and asked whether the victim was housed in their dorm.  (*Id.* ¶ 27.)

After inmate Brown testified, Defendant McKeown continued to the disciplinary hearing proceedings until January 17, 2019.[6]  (*Id.* ¶ 28.)  At that time, Defendant McKeown heard testimony from Defendant Gardzalla about his further investigation regarding inmate Brown's testimony.  (*Id.*)  Plaintiff was present and observed Defendant Gardzalla provide paperwork to Defendant McKeown.  (*Id.*)

At the conclusion of the hearing, Defendant McKeown issued a written statement "regarding the evidence he relied on, the verdict he reached, and the reasons for which he took the disciplinary action.  (*Id.* ¶ 29.)  Specifically, he stated:

> I believe Lt. Gardzalla's written report and testimony of IM Powell's version and the testimony of IM Brown.  The Lieutenant's written report and the CSI statement are further supported by the telephone records indicating that Powell was up and around, completing two

---

[5] Plaintiff avers that inmate Brown has provided him an affidavit that details "his actual testimony and actions of the Hearing Examiner and L.T. Gardzalla."  (Doc. No. 45 ¶ 26.)  Plaintiff has provided a copy of that affidavit with his response. (Doc. No. 45-3.)

[6] Defendants aver that Plaintiff consented to the continuation of the proceedings. (Doc. No. 42 ¶ 28.)  Plaintiff, however, suggests that he did not consent. (Doc. No. 45 ¶ 28.)  Plaintiff avers that the "continued hearing form misconduct # was not the actual misconduct # for the misconduct report B352407." (*Id.*)  He claims that he was "found guilty of a misconduct based on a void and unenforceable hearing against DC-ADM 801 Policy and Procedures." (*Id.*)

telephone calls on the date of the assault as opposed to being restricted
to his bunk with the flu as he and Brown testified.

(*Id.*)   Plaintiff's call log indicated that from shortly before 5:23 p.m. until shortly

after 5:24 p.m., Plaintiff was located in the section of the O building where the

telephones are located.   (*Id.* ¶ 30.)   At that time, Plaintiff dialed the same number

twice, but there was no response each time.   (*Id.*)   From 8:23 p.m. until 8:38 pm.,

Plaintiff dialed the same number as before and participated in a recorded telephone

call.   (*Id.*)

Plaintiff remained in the RHU until April 9, 2019, when he was transferred to

SCI Coal Township.[7]   (*Id.* ¶ 32.)   On April 15, 2019, Plaintiff emailed a contact,

stating, "I caught a lil join down dallas, ci tell on the situation, they ship me."   (*Id.*

¶ 33.)   On August 11, 2019, Plaintiff emailed a different contact, stating: "I told you

about Dallas right?  Banged out over the jack, you know I don't play no games lil

bro . . ." (*Id.* ¶ 34.)   Although Plaintiff had been transferred, inmate Brown remained

incarcerated at SCI Dallas until March 4, 2021, when he was paroled.   (*Id.* ¶ 35.)

Under DOC policy DC-ADM 803, which concerns inmate mail and incoming

publications, "an inmate is precluded from corresponding with a current or former

---

[7] Plaintiff avers that he was sanctioned to ninety (90) days in the RHU for the assault and switched
to administrative custody ("AC") status when his time was up so that he could be transferred.  (*Id.*
¶ 32.)

inmate, parolee, probationer[,] or co-defendant unless approval is given pursuant to the policy." (*Id.* ¶ 36.)

## IV.   DISCUSSION

Plaintiff alleges that his Fourteenth Amendment due process rights were violated in various ways during his misconduct proceedings.  Specifically, he asserts that Defendants McKeown and Gardzalla violated his due process rights because: (1) there was no written statement by the confidential informant, Defendant Gardzalla did not indicate that the informant had provided reliable information in the past, and Defendant McKeown was unable to make an independent determination of the informant's reliability; (2) his right to present witnesses and a defense was violated because Defendant Gardzalla took an unsworn statement from inmate Brown that was later used to impeach his testimony; (3) Defendant McKeown relied solely upon hearsay; (4) Defendant McKeown failed to call the victim or sufficiently investigate if Plaintiff was the perpetrator; and (5) there was no camera recording, no statement by the informant, and the informant was not presented *in camera*.  (Doc. No. 2 at 12-13.)

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Supreme Court has recognized that "prison disciplinary proceedings are

not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). The *Wolff* Court, however, set forth five (5) requirements of due process in a prison disciplinary proceeding: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (citing *Wolff*, 418 U.S. at 563-67). Moreover, if there is "some evidence" to support the decision of the hearing examiner, the Court must reject any evidentiary challenges by the plaintiff. *See id.* at 457. The *Hill* standard is minimal and does not require examination of the entire record, an independent analysis of the credibility of the witnesses, or even a weighing of the evidence. *See Thompson v. Owens*, 889 F.2d 500, 501-02 (3d Cir. 1989). These rights, however, apply only when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).

In his complaint, Plaintiff suggests that he was "deprived of any pre-release [a]nd good time due to [the] disciplinary infraction related to this misconduct."

(Doc. No. 2 at 18.)   In its August 6, 2020 Memorandum and Order considering

Defendants' motion to dismiss, the Court concluded that, after accepting Plaintiff's

allegations as true, Plaintiff had identified a protected liberty interest such that *Wolff*

applied.  *See Powell v. McKeown*, No. 1:20-cv-348, 2020 WL 4530727, at *10 (M.D.

Pa. Aug. 6, 2020).   The record before the Court on summary judgment, however,

establishes that Plaintiff did not lose any pre-release and good time as a result of the

disciplinary infraction.   Rather, he was removed from his job and sanctioned to

ninety (90) days of disciplinary custody.  (Doc. No. 38-2 at 9.)

Defendants assert that Plaintiff cannot demonstrate that he was deprived of

any cognizable liberty or property interest protected by due process.  (Doc. No. 44

at 8-10.)   In response, Plaintiff avers that "[c]onfinement in disciplinary custody

involves a determination of guilt, and the notion that due process must attend such

confinement is readily accepted."  (Doc. No. 46 at 8.)  He claims that Pennsylvania

"follows the norm in reserving disciplinary custody for inmates found guilty of

serious misconduct and has therefore clearly created a liberty interest in [its] inmates

not to be confined in disciplinary custody."  (*Id.*)

Contrary to Plaintiff's argument, however, the Third Circuit has noted that

"confinement in administrative or punitive segregation will rarely be sufficient,

without more, to establish the type of 'atypical' deprivation of prison life necessary

to implicate a liberty interest." *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002). Courts have routinely held that sanctions of disciplinary confinement of up to fifteen (15) months do not implicate due process. *See Nifas v. Beard*, 374 F. App'x 241, 244 (3d Cir. 2010); *Smith*, 293 F.3d at 653; *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997). Furthermore, inmates do not have property interests in their prison jobs. *See Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 171 (3d Cir. 2011).

As noted *supra*, Plaintiff was sanctioned to ninety (90) days of disciplinary custody and the loss of his prison job as a result of the misconduct hearing. These sanctions do "not come close to the type of atypical deprivation [required] to trigger his due process rights." *Fleming v. Pa. Dep't of Corr.*, No. 1:19-cv-113, 2020 WL 3574634, at *7 (W.D. Pa. June 30, 2020). Because Plaintiff's sanctions did not "impose an atypical and significant hardship on Plaintiff relative to the ordinary limitations of prison life, [Defendants are] entitled to summary judgment as a matter of law" on Plaintiff's remaining due process claims.[8] *See Salter v. McKeown*, No. 3:19-cv-1444, 2020 WL 7319780, at *3 (M.D. Pa. Dec. 11, 2020).

---

[8] Because Plaintiff cannot maintain an actionable due process claim, the Court declines to address Defendants' remaining arguments, namely that Plaintiff was afforded due process (assuming that he had a protected interest) and that Defendant McKeown is entitled to qualified immunity. (Doc. No. 44 at 10-14.)

## V.      CONCLUSION

For the foregoing reasons, Defendants McKeown and Gardzalla's motion for summary judgment (Doc. No. 41) will be granted.  An appropriate Order follows.


s/ Sylvia H. Rambo
United States District Judge

Date: June 11, 2021